May it please the Court, my name is Paul Hoffman and I represent Paul Peterson. With me is William Ginego, who represents William Peterson. With the Court's permission, the way we'd like to divide up is that I'll do the opening part of this, and we'd like to reserve five minutes for Mr. Ginego to do rebuttal only on issues that have already been raised and then to introduce new issues in rebuttal. For the most part, we rely on the arguments in our briefs, but I'd like to use the time that we have to focus on the jury instruction issue regarding materiality. And this is an unusual case, I think, where the issue of materiality was the central issue litigated in the trial. And you had conflicting evidence bearing on whether the attribution of source in the gift letters was really important to the government in this context. I'm not sure I understand. I've read your argument. I'm not sure I fully understand it. I certainly understand the disparity between the nonprofits and what the Petersons were doing, but in terms of materiality, isn't it material as to what HUD itself believed, whether their belief was reasonable or not, that you could say, well, you know, their rule is unreasonable because it's not applied equally. They let nonprofits essentially do what the Petersons are doing. And your jury instruction and everything seemed to be pointing toward setting up the reasonableness argument. But it's clearly material because I would think because HUD says, you know, the developer contractor can't give money to or finance the down payment. Well, I guess, Your Honor, the point that we would make is that the test for material or, first of all, the instruction that was given, the starting point for us, the instruction that was given, we contend, is an erroneous instruction. I know you contend, or in connection with this case. Well, period, and in connection. The ninth circuit model instruction. Yes. And we understand that. That's a high hurdle. Go ahead. Jump over it. Yes. Yes, Your Honor. And we say that with respect. But the reason I think the starting point from that standpoint is that all the other circuits that we've been able to find actually have model instructions that are patterned after Kunjis and Gowlin. And Kunjis and Gowlin, we submit, are inconsistent with the standard. The standard that was used, the model instruction, says that a statement is material if it could have influenced the agency's decisions or activities. The Kunjis test says that a statement to be material has to be predictably capable of affecting, i.e., have the natural tendency to affect the official decision. It could have as a very speculative, almost limitless concept, whereas the Kunjis test has some leisure of predictability, that this is the kind of thing that the government official would look at in the regular run of cases, not just some official would look at it in some way. And we also think that the could-have language focuses on the issue on the decision maker rather than the nature of the statement, which the Kunjis test clearly talks about the nature of the statement in the general run of cases. And on all the other circuits that we've been able to find, and we've cited a number of them on page 32 in note 4 of our opening brief, track the language of. . . But if the gift letter had said this money came from the seller directly, the loan wouldn't have issued, would it? Well, but, you know, that I think. . . What's the answer to Judge Ward-Loss' question? She's right. We don't actually know the answer to that question. She's probably right. I mean. . . If you believe Chief Pham, she's right. I mean, if you look at the nonprofit context, though, which happened. . . For example, in the substance of Kansas 1999, you've got a nonprofit thing. Mr. Peterson. . . The Petersons are signing the same HUD-1 addendum that says they're not giving the down payment in connection with nonprofit organizations where it's absolutely clear that the seller is providing the down payment. Now, this is a direct transaction. Well, I mean. . . Besides, I thought Mr. Peterson acknowledged that it was false. He knew. Why disguise it? Why not put it in? We haven't. . . We haven't argued the falsity issue on that. What we've argued and what the evidence. . . Well, then there must be some belief on his part that if he told the truth, they wouldn't fund it. Otherwise, they wouldn't go through the laundering process. Well, I think what his belief was from Mr. Hudgins, and this was disputed testimony, was that HUD really didn't care the particulars, that it could be given to a relative that then put it in, and that this was really a technical kind of requirement. They didn't care. Why did he bother to disguise it? Well, the question still is. . . It's counterfactual, I guess. Excuse me? It's counterfactual. Your argument is it's not fair, it's unreasonable on their part, because they allowed the nonprofits to do it through what is essentially economically the same consequence. Well, I think that. . . Structured somewhat differently. I mean, whether. . . I mean, unfairness is not part of our materiality argument. I think it's. . . I don't know whether it is or not. I mean, what the argument is, is that really. . . They really didn't care. They don't look at where it came from. If it said that it came from a stepfather or somebody that acted like a father but isn't really the person's father, would they really care? Probably not. Do they care about it comes from the seller? In exactly the same kinds of transactions, they allow the seller to give it essentially directly. Everybody knows what's going on, basically, that the seller is providing the money, and it's functionally the same as what Mr. Peterson was doing. Now, our point, although we do have a sufficiency of the evidence argument, the point on the jury instructions really is that if the jury instruction removes this question. . . I mean, what we're saying is a reasonable jury could have decided in the evidence in this case that they really didn't care, that Mr. Pham's testimony was about the policy of HUD, but that in actual fact. . . that a jury could have found that HUD really doesn't care, that they have this situation where sellers provide the down payment and sign the same forms that Mr. Peterson signed and, in fact, signed afterwards. And I think the point of the test, the Klinge's test, is that you don't want. . . Materiality, I think, protects people from the government coming back at a later time and saying that something's really important when they found the false statement later when things go wrong. Did your side object on Klinge's and Gowden grounds to the instruction that you're complaining about in the trial? I don't believe that those cases were stated at the time of the objection. What happened was you simply proposed an alternative instruction. Well, but they proposed an alternative instruction that basically was consistent with the Klinge's, Gowden test, and specifically said what was wrong with the instruction. Is the government right, then, that we review this for plain error? No, we don't believe so, Your Honor. We think that the objection was sufficient, was adequate to. . . It sure sounds a lot different now than it reads in the trial court. Your Honor, I think that it was fairly clear what the. . . Fairly clear? I think it was clear what, from the beginning, the defendants were arguing. If we have to think it was clear, it means it wasn't. I think it was clear, Your Honor. I think that what the defendants were arguing was that the Ninth Circuit model instruction was far too broad and allowed for materiality, for idiosyncratic decisions, for possibilities, for speculation, rather than something that focuses in on the importance and significance of the statement for the government entity. And what the objection was, was that the model instruction did that. There was a specific objection to that particular instruction. And the proposed alternative instruction was clearly modeled on Klinge's and the idea that the statement had to be related to something important or significant. Are you planning on talking about restitution at all? The only point I'd make on restitution, and I'd like to leave Mr. Genega his time, is that there really wasn't any factual findings or evidence that the defendant's conduct approximately caused the losses in this case. And there was lots of evidence that what happened in the case is that people defaulted for other reasons. These were otherwise qualified buyers. They all had the kind of the – there was no argument that they didn't have the right kind of credit rating, that their applications were otherwise a problem. The fact is they got the down payment. Where they got the down payment didn't affect the economics of the transaction in any way that anybody had any evidence of in this case. And we think there's just a complete absence of proof where you have evidence in the record that what happened was people had marital difficulties, they lost their job. The other things happened that caused them to default, which is what, in fact, caused the effect. And I think it's clear under the law that the government has to show a direct and proximate relationship between what the defendants did and the particular losses in question. And they didn't. And I think the government admits the right standard and really just says that take a look at the record. It was foreseeable. And there's really no evidence to show that that's true, that these were intervening events that the government is trying to make these people responsible for, and their conduct didn't cause these losses. I'd like to reserve the rest of the time for Mr. Ginelli. Thank you. May it please the Court. Good morning, Your Honors. Bill Crowfoot for the United States. The defendant's proposed jury instruction really points to what, in their view, the case was about before the district court. And that jury instruction did not introduce the Gowden issue, but rather essentially requested that what they wanted to do was, and what their jury instruction said was, a statement is material if it's important or significant to the government program to which it was submitted. And then in argument, defense counsel indicated that their view was that the government material statement had to be significant to the purposes of the program. And the government would argue, Your Honors, that at the district court level, there was no factual dispute about the falsity of these statements, or even about whether those statements were in fact material to the agency's decision-making process. What defense, the defense really wanted the jury to do was reach some sort of a judgment about whether, even if these statements were materially false, should that have mattered. And that's what introduced that whole discussion of comparing what defendants were doing with what was going on with the nonprofit programs. And both in direct testimony and in this cross-examination, the HUD expert was very, very clear about the fact that sellers were not permitted to make these contributions. And these statements, if they had been correctly stated, would have said we, the sellers of the property, provided the gift funds. It is very clear in the course of direct and cross-examination that had those gift letters been in the HUD binders when this insurance had to have issued, the insurance would not have issued. The testimony of the defense counsel have argued, well, really what he said was that the, they suggested the government was arguing that the mere fact of falsity, as opposed to the nature of the falsity, is what the government was arguing was material. And one question to Mr. Pham read out of context of what had led up to that might lend some credence to that argument. But, in fact, the jury had heard a number of buyers speak to the issue of the false gift letters and what the nature of that falsity was, i.e., that those donors had not put up the money. Mr. Pham testified to the fact that that was the critical issue in those letters. And so by the time we get to the question, well, would you have provided this insurance if you had known that these were false, the answer is clearly no. And the jury was in a position to understand what he meant by that based on everything that had heard up to that point. When Defendant Paul Peterson testifies, that becomes even more manifest for the reasons that the Court has already inquired of defense counsel when they were before you. It is, there is no insufficiency of evidence on the issue of materiality, Your Honors. And the issue of whether or not the jury should have been allowed to get into the policy behind or get into questioning the reasonableness or the value of HUD policy was something that was not, would not have been properly before them. The question for the jury was, did this matter to HUD? The answer was very clear. Yes, it did. Any number of people could provide gift funds, but not the sellers. And was there a difference between what the sellers were doing and what the nonprofits were doing? Yes, there was. There was a structural difference, there was a difference in the way HUD dealt with that, and HUD itself recognized issues and concerns with those distinctions in terms of what they were trying to accomplish by preventing an identity of interest between sellers and buyers on the whole issue of down payment money. The government maintains that, for the reason it just sort of alluded to, that the defense's objection to the jury instructions was not one based on Godden, but really one intended to lead to a different sort of jury consideration of the facts of materiality in this case. Isn't the restitution somewhat attenuated in this case? I beg your pardon, Your Honor? The restitution, isn't it somewhat attenuated from the crimes? Your Honor, this is a, presents a difficult case on restitution, Your Honor. It is, the government would actually say no. That's a good characterization, because I'm having a really difficult time with this restitution award being a direct, directly and approximately caused by the fact that the seller gave the down payment. I mean, after all, the program itself, we went on the website and looked at the program. I mean, you know you're loaning to people who have inherently risky situations that HUD advertises or promotes the program to people, even people with low credit ratings, even people who have had bankruptcies. So the fact that one person gave the money versus another person, I don't see how that, and particularly given the evidence in the case, the testimony that this person lost hours, that person left the girlfriend, this other person, the mortgage rate was adjustable, went up, could no longer afford it. Those were the reasons for the foreclosures. I don't see how the fact that the Peterson's signed or did what they did directly and approximately caused the loss between the selling, especially given some of HUD's delays in action, between the selling of the house in a time when the housing markets are going down and, you know, the amounts it could get. The, in this case. Is that the standard, by the way, direct and approximate? The standard, Your Honor, is that the loss has to have been caused by the offense conduct and that if there is an intervening cause, it has to be related to, directly related to the offense conduct. What does the statute say? That actually emerges from the case. Isn't the answer to Judge Fischer's question yes? Doesn't the statute say exactly that, directly and approximately caused? Yes, Your Honor, it does. You're talking about the Hackett case, aren't you? No, I'm actually talking about the McKay's case and that line of cases that's actually cited in our brief and I believe actually in the defense brief as well. I'm sorry. In the government type case, yes, Your Honor. And there are intervening events here. Yes. In each of these instances, as the Court has pointed out, there are, you know, the loss of, the girlfriend left or the job went away or a number of different things happened. And so the question becomes then whether these are intervening events that are somewhat disassociated from the offense conduct. And for the very reasons that Judge Worbel has indicated, the government would answer no. The parties here, the lenders and the sellers are selling and lending into an environment which they know to be very risky. That's the very purpose of the program. That's why the program was set up, to enable them to then, in this case the sellers, to subvert one of the provisions of the program, one of the credit protections in the program, and then evade responsibility for the economic consequences of that subversion would be a bad outcome. Particularly because they know, they know going into this, and Paul Peterson says this one is very clear, they began to do this because they were not selling houses. They were not selling houses because the people they were trying to sell to, their market was very marginal. They could not come up with even the very small amounts of cash investment that they were required to come up with. And so they said, well, we'll put up that money and we'll lie about it and that will enable us to move the houses. Now, is that credit protection for the HUD program the best and most solid in the world, i.e., you know, the need to have gift letters or to come up with other people? Well, no, it wouldn't be the best kind of credit protection in a normal commercial lending program. But what do we know about these 43 people? We know that they would have continued making their payments, but for these other things that happened to them, not but for the fact they got the loan from the seller as opposed to somebody else. Your Honor, the – what we know about these people, if we're the seller in this case, we know we're – No, no, I'm talking at the time of the loss event, which would be the foreclosure.  Obviously has to be measured by what they knew at the time they were making those sales. And they were making – Which is what? That those people wouldn't have been there if it hadn't been for their behavior in the first place? Correct. Those people would not have been – So their behavior enabled economically sketchy people to be at a position to lose – to have these things go wrong. That's correct, because in the final analysis, they had no relative, no friend, no other person, no money under the mattress, no non-profit, in part because those non-profit programs did not apply for a significant period. They had nobody else to come up with that money, even that small amount of money. There wasn't anybody else out there who would make any kind of a judgment that, well, okay, I'll fork over three grand to my cousin, friend, wife. What about the guy who just lost interest in keeping the house after his girlfriend moved out? I mean, there's nothing in the record that says he couldn't have kept paying the payments. He just lost interest. It's because he didn't have any equity in the house. He had no stake in the deal. And that's one of the things that Pham testified to. If you've got a stake in it, you're more likely to stick with it. That's correct. And the issue is not whether that's the biggest stake in the world, a 20 percent down payment or a third-party guarantor. It's a stake of some kind. And it is, in fact, as it turns out, a relatively small stake even by the requirements of a program. But it is a stake that the sellers understood to exist from the very beginning. Can I ask another sort of slightly different question? I know this wasn't discussed below necessarily, but did HUD have any insurance on these losses that the defendants were ordered to pay restitution for? I mean, any insurance or reinsurance? Usually, certainly private lenders would have insurance on the loans. Yes, Your Honor. The issue of whether or not these loans were securitized did not come up. But what HUD, what Mr. Pham did testify to was this. In a sense, HUD, in effect, is its own insurer. The purchase, the PMI, the purchase money insurance fee that a buyer would put up front would go into an insurance fund, and from that fund HUD would pay out to banks should they have lost money based on a default. And what Mr. Pham did testify to was that the amount of that insurance, the payment that buyers have to make fluctuates depending on the loss history of that fund. So, of course, it is important to HUD to keep down the losses to the fund, and he indicated historically that up front fee has been coming down. I think he testified that around this time it was at somewhere above $200,000. So was this insured fund calculated in any way in terms of the calculation of the restitution amount? Your Honor, the restitution amount in this case is based on the loss to HUD, and that is the value of the property at the time HUD took it over versus what HUD had to pay to the bank that it was insuring, including interest and payment and principal lost by the bank. So it's HUD's out-of-pocket money? It's HUD's out-of-pocket money, but calculated as of a specific date. The intention of calculating it as of the date that HUD takes it over is to actually avoid inflating the restitution amount by further deterioration in the price of that property until it's sold. Loss is calculated differently, and that is actually spelled out in the document. But it's not, in this case, it is the loss to HUD as opposed to the unjust enrichment of the sale. So my question then would be, so that amount that was paid out by HUD to the bank, was that, did HUD have reinsurance for that? I mean, it's sort of the first line of insurer, and then was there reinsurance? And to the extent that it has some sort of reinsurance program, that was not a part of the record. I actually don't know the answer to that question. What he did say was HUD has a fund from which it pays out these things, these compensations, and which it feeds with the fees that it charges buyers up front when they leave. And that fund was diminished by the million in change that we're talking about in this case? That fund would have been. That's where they would pay their insurance fund. Okay, thank you. Thank you. May it please the Court. William Janago on behalf of Mr. William Peterson. To get to the restitution issue, first of all, there is no evidence in the record in which the government proved by a preponderance that the false statement was the direct and proximate cause. That is a statutory requirement, section 3663A2, which is on page 42 of our brief. And the government, I think, and I think below, they substituted the sentencing guidelines analysis, which is foreseeability. And that's why Mr. Crowfoot talks about what Mr. Peterson knew at the time that they made this transaction, as opposed to restitution, which is clearly different under United States law, which is controlled by the statute, which says the government has the burden by a preponderance of introducing evidence that there's direct and proximate causation. As to the stake in the interest, could they have proven that? That's unknown. The government had to introduce evidence that their inability, their default on the mortgages at the time that it occurred was somehow directly and proximately related to the false statement. And if there were intervening events, that they were. The problem I have with that argument is that if we interpret direct and proximate in this context, the way you are, they could never prove it because, by definition, the buyer, once the buyer has possession of the house, they're not going to stop paying or they're not going to go into default because of the gift letter fraud. They're going to, the reason for the nonpayment is going to stem from whatever individualized circumstance they may have. Therefore, for purposes of this violation, there will never be a restitution because you could never show that it is the direct and proximate cause in that sense, unless you accept the proposition that if there hadn't been the gift letter fraud, they wouldn't have taken possession of the house and there never would have been an exposure. Whatever exposure HUD was willing to take on high-risk borrowers, this high-risk borrower would not have come into possession of the property because the one screen that they did put in was the 3 percent down payment. From that thereon, I mean, they're at the exposure of whatever happened once the guy or the people got possession of the title of the house. Judge Fischer, I think that what you're looking at is the but-for causation with respect to the transaction, but what you really need to look at the restitution is the but-for causation as to the loss. It may be. You could never show it. I can't imagine. How could they show it? How could they show it? I mean, assuming Judge Fischer is correct, in what way could the government show it? They perhaps could show it by introducing evidence that all of these borrowers defaulted after the first payment, not after 12 months where they actually were able to make the payment for a little while. It had nothing to do with their economics. And the other point that I think, I mean, it may be that they could never prove it. Think about the non-profits. The non-profit people who are allowed to do the same transaction, they don't have any stake in it. The point is that the government in its program put a screening mechanism in and then structured one where they permitted non-profits to take an exceptional route. The Petersons, well-intentioned or not, didn't go to HUD and get an approved exception to the seller ban. That's true, Judge Fischer, but I think that has to do with the crime rather than the loss. Restitution is an additional penalty that they've got a burden approving. And when you look at what happened here, I mean, the fact of the matter is that the 3 percent PMI that he refers to, that is they get the money up front for the insurance. They made sure they get that money, and the insurance rate varies according to the default rate. So they are covering themselves against the possibility of restitution. And maybe that's why they do that, because they know they're never going to be able to prove restitution by a direct and proximate causation. But they get the money up front as part of the transaction. So I think that they are covered that way. Is there any case that is similar, presents facts similar to this one in which restitution was awarded? Not that I know of. I know of cases, for example, the Mixian case was a case where a restitution award got reversed in a false statements case because there was not direct and proximate causation. So I don't know of a case where it's ever been proven in this context. And I think that maybe that they can't prove it. Maybe that's why they get the insurance money up front. What's the purpose of the rule that we're talking about that Pham testified to? In light of the non-profit, I think that's a very hard question to answer. Well, I withdraw the question, because I don't want to hear about non-profits. Thank you very much. All right. Thank you. Can I just? I mean, I don't want to withdraw. I withdraw it. Thanks. Is that right? We know the arguments from the briefs. Could I just? There was one point that I wanted to make about the false statement. And that is the defense specifically identified the defects. And this is at page 209 of the excerpt of the record. They talked about the two words. It's could and affected. Those are the activities that are the could language and the activities language in the instruction was what was defective. And they identified that. And in this case, the jury could have relied on the activities part of that, because there was testimony about the fine and guilty. And could they have found it material? Yes. It's possible. But the question is whether they could have acquitted him based on this evidence. And I think on that basis, you would have to conclude that it was harmful. All right. Thank you, counsel. United States versus Paul Peterson and William Peterson is submitted. And we'll take up Nash. I'm going to totally box this word, this name. I apologize. Nash. Nash. Nash. I'm not going to try. Versus Woodford.
judges: Trott, Wardlaw, Fisher